IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 6, 2012

**MICHAEL A. VIRGA v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Putnam County**
**No. 05-0629     Leon C. Burns, Jr., Judge**

**No. M2012-00305-CCA-R3-PC - Filed January 25, 2013**

The petitioner, Michael A. Virga, appeals from the post-conviction court's denial of his petition for post-conviction relief from his first degree felony murder and aggravated arson convictions. On appeal, he argues that he received the ineffective assistance of counsel and that he was denied the right to trial by a fair and impartial jury. After review, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Ricky L. Jenkins, Sparta, Tennessee, for the appellant, Michael A. Virga.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel; Randall A. York, District Attorney General; and Anthony J. Craighead, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted by a Putnam County Criminal Court jury of first degree felony murder and aggravated arson based on his burning down the house trailer where he resided, which resulted in the death of his girlfriend, Rochelle Hinrich. State v. Michael A. Virga, No. M2008-00209-CCA-R3-CD, 2009 WL 537560, at *1, *5 (Tenn. Crim. App. Mar. 3, 2009), perm. app. denied (Tenn. June 15, 2009). He was sentenced to concurrent terms of life imprisonment and twenty years. Id. at *8. This court affirmed the petitioner's convictions on direct appeal, id. at *12, and the Tennessee Supreme Court denied his

application for permission to appeal.

The underlying facts of the petitioner's case were recited by this court on direct appeal as follows:

In the late night or early morning of August 7 and 8, 2005, firefighters responding to a fire at a trailer in a neighborhood on Shag Rag Road in Cookeville, Tennessee, discovered a female's body in the bedroom of the trailer. Agents from the Tennessee Bomb and Arson Section investigated the scene. During the investigation, the [petitioner] and his roommate, Steve Tracey, who lived at the trailer with the victim, were present at the scene. The agents interviewed the [petitioner], who confessed to setting the trailer on fire.

On November 8, 2005, a Putnam County grand jury indicted the [petitioner] on three counts. Count I alleged that the [petitioner] "did unlawfully, intentionally and with premeditation kill Rochelle Hinrich in violation of T.C.A. § 39-13-202," Count II alleged that the [petitioner] killed the victim "during the perpetration of or attempt to perpetrate arson in violation of T.C.A. § 39-13-202," and Count III alleged that the [petitioner] committed aggravated arson by "unlawfully and knowingly damag[ing] a structure with one person therein by means of a fire without the consent of all persons who had possessory, proprietary or security interest therein in violation of T.C.A. § 39-14-302." Prior to trial, the State dismissed the premeditated murder charge (Count I) and proceeded on the theories of aggravated arson and felony murder resulting from aggravated arson (Counts II and III).

*Suppression Hearing*

The [petitioner] filed a pretrial motion to suppress arguing that his statements given to law enforcement agents were "unlawful because they were involuntary due to the severe intoxication of the [petitioner]," because "[t]he [petitioner] had not had any sleep and did not understand what was happening at the time he gave the statement," and because "[t]he statement was not written by the [petitioner] and does not accurately reflect the oral statement given by the [petitioner]." The statement at issue was given to Agents Scott Greenwood and Greg Whittaker of the Tennessee Bomb and Arson Section. The confession reads, in full,

On 8-8-2005 at [approximately] 12:00 [a.m.] I Michael

-2-

A. Virga was asleep on the couch at my [m]obile [h]ome. I woke-up, I had been very upset about my bills. I decided that I was going to set the [h]ouse on fire. I went outside and got the gas can that had [approximately] 1/4 gal[lons] of gas inside it. I then went back into the house trailer and poured gas along the front of the T.V. I then went over to the stove and got a ½ gallon of cooking oil and I poured the oil on the stove[,] the refrigerator[,] and microwave and counter-tops. I then went back over to the sink area and lit[ ] the oil. I then left and went over to where that I had poured the gas out and lit[ ] it. When I lit[ ] the gas it flashed up and my nose and hair caught on fire. I reached and grabbed the gas jug and threw it down as I was going out the front-door. I then ran around the [m]obile home and turned left and went to the back door. When I got to the back door I meet Steve, I ask him where Rochelle was, Steve said that he thought that she was still inside. I then went inside the back door and went into mine and Rochelle[']s bed-room and felt around on the bed trying to see if I could find Rochelle, I couldn't find her. I was having trouble bre[a]thing, I [was] also having trouble seeing. I finally got outside the bedroom door as I was leaving I burned my arm as I[ ] went [through] the door-way. I got outside and stood away from the fire and watched it burn. I was very upset and a police officer had to physically restrained [sic]. This all being due to the fact that I knew I had set the [m]obile home on fire.

Steve Tracey had no knowledge of the arson. I just woke up and decided that if I could get rid of the [m]obile home that me and [Rochelle] would not have no more worr[ie]s and we would not be[ ] fighting anymore. I Michael A. Virga didn't [plan] this fire, I just woke-up from the couch and decided to do it.

I give this statement of my own free will, no promises or threats have been made. I fully understand my <u>Miranda</u> Rights.

The statement was signed by the [petitioner]. The document indicated that it was "taken by" Agent Whittaker and "witness[ed]" by Agent Greenwood.

The trial court held a hearing on the motion to suppress, and defense counsel argued that "the court should consider that [the petitioner] had been severely intoxicated the night before, that he had been sleep deprived and did not understand when he gave the statement that . . . the written statement did not reflect his oral statement given to the officers."

The State called Agent Scott Greenwood of the Tennessee Bomb and Arson Section. Agent Greenwood testified that he had been assigned to investigate the trailer fire and the death of the victim. He reported to the scene at approximately 2:00 a.m. on August 8, 2005, but, when he first arrived, the [petitioner] was being treated for burn wounds at the hospital. He testified that on the "morning" of August 8, the [petitioner] returned to the scene; however, Agent Greenwood did not speak with him during this time. At some point, the [petitioner] left the scene with Mr. Tracey, his roommate, and he returned about 30 minutes to an hour later with a 12-pack of beer. Agent Greenwood instructed law enforcement personnel to prevent the [petitioner] from consuming any of the beer because he wanted to speak with him later. Agent Greenwood testified that he then spoke with the [petitioner] at the scene. He stood two or three feet from the [petitioner], who did not appear intoxicated.

The [petitioner] was later transported to the Putnam County Sheriff's Department for further questioning about the suspected arson. Agent Greenwood testified that, to his understanding, Agent Whittaker had administered the [petitioner] his <u>Miranda</u> warnings. He said, "We actually have a sheet that lists them all out," and the [petitioner] signed the sheet. He described the protocol that he followed during the interview, "We'll talk to them, get a statement from them, take notes from that and then write out the statement, read the statement back to them, make sure that that is . . . their word and then have them sign the bottom of the sheet." According to Agent Greenwood, at no time during the interview did the [petitioner] object to the accuracy of the written statement. He testified that the [petitioner] signed and dated the statement at 6:45 p.m., August 8, 2005. Agent Greenwood also drew a diagram of the trailer and "had [the petitioner] point out on the diagram . . . where he did everything and what order he did it in and then . . . had him sign off on it." Agent Greenwood testified that the [petitioner] did not appear sleep-deprived or intoxicated during the interview.

On cross-examination, Agent Greenwood acknowledged that he was not aware that, when the [petitioner] was admitted to the hospital earlier that

morning, he had a .16 blood alcohol content.[1] He testified that the [petitioner] had "a burn on his nose and a burn on one of his arms." Agent Greenwood stated that the [petitioner] did not complain and did not appear to be suffering from any pain during the interview. He also noted that the [petitioner] seemed fairly calm during the interview.

Agent Whittaker's testimony was substantially similar to that of Agent Greenwood. Agent Whittaker interviewed the [petitioner] immediately before he confessed. He said, "[T]he [petitioner] started out by saying he had nothing to do with it, then he became emotional, started crying and said he did it." He testified that the [petitioner] did not appear "too intoxicated" or "too sleep deprived" to "know what he was doing." Agent Whittaker hand-wrote the [petitioner]'s statement and, along with Agent Greenwood, reviewed the accuracy of the statement with the [petitioner].

On cross-examination, Agent Whittaker noted that the [petitioner] never fell asleep during the course of the interview. The [petitioner] only complained that he needed an inhaler, and Agent Whittaker attempted to arrange for an inhaler. He admitted that no video or audio recordings existed of the interview.

The [petitioner] testified in the suppression hearing that, after the fire, he was taken to the hospital for "[s]moke inhalation and . . . second degree burns on [his] arm and on [his] face and [his] nose and [his] cheek" but that he refused any medication from the hospital. He was released from the hospital at approximately 6:05 a.m. He then returned to the scene of the fire. He testified that he and his roommate, Mr. Tracey, left the scene for approximately one and a half to two hours. During this time, the [petitioner] testified that he purchased alcohol. He purchased a 40-ounce beer to "slam down" to "calm [his] nerves," then returned to the scene.

The [petitioner] testified that he had been drinking alcohol "[a]ll day" on August 7 prior to the fire. He said, "I started drinking around 9:30 or 10:00 that morning, so I was pretty drunk."

The [petitioner] estimated that he was taken to the Sheriff's Department at 1:30 or 2:00 p.m. on August 8. He testified that he did not remember much

---

[1] Although defense counsel asked this question, he never presented any evidence during the motion hearing to establish that the [petitioner], in fact, had a .16 blood alcohol concentration at the hospital.

of his interview with law enforcement officers. He said, "I don't remember really too much of anything from that night until the next morning when I woke up or afternoon. I didn't have no sleep for almost thirty six hours." On cross-examination, he clarified that he had slept from 12:00 or 1:00 a.m. until 6:30 or 7:00 a.m. on August 7, and he briefly slept from approximately 10:30 p.m. the night of August 7 until the fire woke him around 12:00 a.m. on August 8. The [petitioner] testified that he only remembered discussing a gas can during the interview. When asked why he could not remember, he responded, "It was very little sleep, I mean . . . I slept with my girlfriend nine years and everything. And I walked out with a pair of shorts. I tried to go back and get her, I mean . . . being burned I in my mind was just kind of stuck somewhere else." He said that, during the interview with the agents, "[he] wasn't intoxicated, trashed intoxicated. But . . . [he] slammed that forty [ounce beer] pretty quick."

On cross-examination, the [petitioner] stated that he had not met or encountered Agents Greenwood and Whittaker prior to August 8. He explained that he worked as a painter and, on August 7, the day leading to the fire, he had "a job" at 7:45 a.m. He stated that he would drink during his jobs. He testified, "I usually brought a couple of beers with me and leave [the victim] some. We'd usually leave around 11:00, 11:30, I'd bring up another twelve-pack and bring it to her, sit there and have another couple of beers." He described himself as a "heavy drinker" of 14 years. The [petitioner] explained that he could drink "a couple of beers and . . . have a buzz and hide it, not be staggering around and slurring [his] words, but still be buzzed." He could drink a six-pack of beer and perform his job as a painter.

The [petitioner] stated that he did not eat breakfast or lunch on August 7, and he only "nibbled" at dinner. He said, "We went home around 11:00 [a.m.], brought our beer, I started drinking more . . ., we went back to the job, . . . we sat there for about an hour drinking more beer, packing our tools up. I didn't even go back, I didn't even work after that, I just went in and packed up my tools and left [be]cause I had too much of a buzz." He testified that he fell asleep on the couch around 11:00 p.m. He maintained that he did not set the fire.

The [petitioner] rode in a law enforcement vehicle to the Sheriff's Department for questioning. He stated that he did not feel he was "free to leave," and he explained, "[W]hen I first got there I asked if I could go out and have a cigarette, they wouldn't let me go out unless somebody went with

me. I couldn't go to the bathroom unless one of the detectives went with me." The [petitioner] testified that, although he had not been formally charged with any crime, he thought he was under arrest at the time of the interview.

When confronted with the written statement of his confession, the [petitioner] said, "It's a statement but I'm not saying that's what I said." He acknowledged that he signed the statement and the diagram of the trailer. The [petitioner] testified that he was basically "blacked out" when he gave his statement to the agents. He only remembered mentioning about a gas can because "[he] had a gas can sitting out by the trailer, with no gas in it usually. [Because] Steve used it, too. There was an RV the owner of the, the landlord had, and Steve had a tendency of running over there and ciphoning [sic] gas out of it."

At the close of the hearing, defense counsel argued, "The entire facts taken together . . . indicates under the law that the statement that he gave was not voluntary and should be suppressed." The trial court noted that "factors that the court is to consider [are] the characteristics of the [petitioner], his age, intelligence, mental condition, physical condition, criminal experience, background, the length of interrogation. . . . And the court in this case has looked at and considered all these factors." The trial court credited the agents' testimony about the [petitioner]'s sobriety and demeanor and noted that the statement at issue was "very detailed . . . about what happened." The trial court also found the [petitioner]'s testimony not credible, and it denied the [petitioner]'s motion to suppress. In a written order, the trial court found that "[petitioner]'s statement given to the investigators on August 7, 2005[,] was given knowingly, voluntarily, and intelligently, and is therefore admissible."

*Trial*

At trial, the State first called Beulah Jean Thompson, the victim's mother. She testified that the victim was 32 years old at the time of her death. She stated that the victim had dated the [petitioner] for nine years, and they had lived at trailer "number C" at Shag Rag Road for four or five months before the victim's death. She last spoke with the victim at 9:58 p.m. on August 7, 2005. She testified, "I was supposed to go over and pick [the victim] up the next day after work, at 11:00, to take her over to my place, because she was leaving [the petitioner]." However, she received notice that her daughter had died at 2:00 a.m. that morning.

Kenneth Winningham was a neighbor of the [petitioner] and the victim. He testified that he was in his bedroom with a toothache when he "[saw] this big flash and hear[d] a big racket." He stuck his head out his window and saw the trailer on fire. He said, "On the front side of it, it was really blazing really bad," describing the living room area of the trailer. Mr. Winningham then ran outside toward the burning trailer. He saw the [petitioner] in the back yard, and he saw Mr. Tracey across the road on "a little graveled road that goes into the trailer park." Mr. Winningham "asked [the petitioner] where [the victim] was at, and he said his baby was gone. But the fire was blazing so high, . . . if she was up in that part of the house, she was gone."

Mr. Winningham then ran to the front yard of the trailer, and when he returned, Mr. Winningham's roommate, Anthony Moon, was speaking with the [petitioner]. Mr. Winningham testified that the [petitioner] said to Mr. Moon, "Why did I do it?" Mr. Winningham did not see the [petitioner] attempt to run back into the trailer, although he asked the [petitioner] about saving the victim several times. After the fire department arrived, he did not see the [petitioner] again that evening, but he thought "the arresting officers took [the petitioner] out of there."

The following morning, the [petitioner] stopped by Mr. Winningham's trailer and asked to leave a bag of clothes at his trailer. Mr. Winningham testified that the [petitioner]'s demeanor was "[j]ust calm." He testified, "[The petitioner] said that, if a shorted wire or something or another, burned the trailer, he was going to sue the trailer park, or something or another, like in that coloration."

On cross-examination, Mr. Winningham stated that he was not on any medication for his toothache that evening and that he had not been drinking alcohol. He clarified that he stayed at the scene of the fire until the fire department arrived.

Michael Keith testified that he had worked as a firefighter for 22 years, and he was employed with the Murfreesboro Fire Department and volunteered with the Putnam County Fire Department. When he first got to the scene at Shag Rag Road, he saw a single-wide mobile home, "approximately three-quarters involved in fire, with fire coming from the remainder of the other quarter, which was pretty much involved also." Mr. Keith described the trailer as "free burning" – the "worst" stage of a fire. From the outside of the trailer, he could see the victim's body in what he assumed was a bedroom.

The victim's body was found "where the least amount of fire was." He encountered the [petitioner] at the scene, who informed him that his girlfriend was in the trailer. On cross-examination, Mr. Keith stated that the [petitioner] had to be restrained by Sheriff's deputies to prevent him from running back into the trailer.

William Smith testified that he owned the trailer at Shag Rag Road that burned down in August 2005. He owned the trailer park, which was named "Woodland Trailer Park." He testified that the victim had rented the trailer from him on April 2, 2005, and that she paid rent for the trailer. Mr. Smith testified that he did not give the [petitioner], nor anyone else, permission to burn his trailer on Shag Rag Road.

Scott Greenwood testified at the trial. By the trial date, Agent Greenwood had left the Tennessee Bomb and Arson Section and joined CSX Transportation as a railroad detective. Agent Greenwood's testimony consisted largely of the same testimony given at the suppression hearing.

Agent Greenwood also testified about his examination of the crime scene after the fire had been put out. He found the victim lying on the floor. He said, "I believe her head was at about the foot of the bed . . . or next to the bed, and her feet were towards the head of the bed. . . . [The body] was burned pretty badly. You . . . could still tell it was a body, but a lot of hair was burned off. It was in pretty bad condition." Agent Greenwood observed "pour pattern[s]" both on the trailer's living room floor and the kitchen cabinets. He examined the residence for any accidental causes of fire, such as electrical wiring, however "[a]ll of the fire patterns led [him] right back into the floor." Agent Greenwood found holes burned through the floor, which indicated that a liquid accelerant had been poured and ignited in the area. He also observed a "rainbow" in a puddle of water on the burnt floor, which also indicated the use of an accelerant. He took a sample from the floor to send to the Tennessee Bureau of Investigation ("TBI") crime laboratory for analysis. In the kitchen, he found evidence that cooking oil had been poured as an accelerant. Agent Greenwood also found an empty gas can outside the trailer's front door, and he testified that the [petitioner] indicated that he used that gas can to start the fire. He testified that he called Special Agent Robert Watson from Knoxville to examine the scene with his trained dog.

Agent Greenwood testified that he went to the Sheriff's Department after his investigation of the scene. He interviewed Mr. Tracey for

-9-

approximately four hours, then Agent Whittaker interrupted this interview to inform him that the [petitioner] had confessed. Agent Greenwood testified that the [petitioner] said that he was upset with his financial situation and burned down the trailer. The [petitioner] said that he "was sitting on the couch and took a lighter, leaned over in the floor and struck the lighter, and when he did, the flames flashed up on him and burned his arm and burned him on the nose." Agent Greenwood posited that the [petitioner]'s confession was consistent with the burn patterns that he observed.

On cross-examination, Agent Greenwood stated that he was aware that the [petitioner] had stated to another agent that he did not start the fire. He described the [petitioner]'s demeanor during the interview as "just kind of . . . he seemed calm. He didn't . . . seem real upset about . . . what he was telling me." He admitted that he was aware that the [petitioner] had been awake for "quite a period of time" but maintained that the [petitioner] never indicated that he was tired. He also stated that he was aware that the [petitioner] worked as a painter and kept paint thinner – which can be used as an accelerant – in the trailer.

Agent Whittaker also testified to facts substantially similar to those he presented during the suppression hearing. He explained that he was assigned to assist Agent Greenwood with the investigation and that he was speaking with the [petitioner] when he confessed. He said, "Basically we sat down and started talking about the fire, and [the petitioner] broke down and started explaining that he had set the fire." He stated that the [petitioner] "became emotional." Agent Whittaker had spoken with the [petitioner] for five to ten minutes when he "broke down," and, at that point, Agent Whittaker stopped the [petitioner] and found Agent Greenwood. The State introduced the [petitioner]'s written statement into evidence through Agent Whittaker's testimony and presented it to the jury.

Agent Robert Watson of the Bomb and Arson Section testified that he was a certified fire investigator and handler of a hydrocarbon-detection dog. He testified that he had been with his dog since 2000, and he had taken her to "hundreds" of fire scenes. He "works" his dog 365 days a year, and he said, "There are 2730 some odd distractors that she had been checked off on." Agent Watson testified that he arrived at the scene per Agent Greenwood's request. His dog "alerted in two different areas, indicating . . . that there was an ignitable liquid in the floor area." He cut samples from the floor where the dog alerted for later analysis by the TBI. On cross-examination, Agent

Watson clarified that his dog was not trained to alert on "accelerants," but she was trained to alert on "hydrocarbon," which is a component of an ignitable and/or combustible liquid.

Agent Randall Kirk Nelson of the microanalysis unit of the TBI crime laboratory analyzed the fire debris to identify the presence of any ignitable liquids. He stated that the sample provided by Agent Greenwood "revealed the presence of turpenes, which are present in turpentine and occur naturally in some wood products." However, he found that the samples from Agent Watson "revealed the presence of an evaporating gasoline-range product. Products in this range include all brands and grades of automotive fuels, including gasohol." He explained that this "evaporating gasoline-range product" could not be paint thinner, because, although an accelerant, paint thinner is a wholly different classification.

Doctor Amy R. McMaster testified that she was an employee of Forensic Medical, the company hired to perform the autopsy on the victim. Doctor Wayne Kurz, a training physician, performed the autopsy under Doctor McMaster's supervision. She stated, "The cause of death is officially listed as smoke inhalation and thermal injuries." She testified that Doctor Kurz "estimated . . . about 90 percent of [the victim's] total body surface area was burned." The victim had "[f]ull thickness burns" that were located "down the entire depth of the skin and sometimes even deeper." Doctor McMaster testified that "soot" was found in the victim's airway, "which is evidence of smoke inhalation." She explained that the victim "was alive and breathing at the time the fire was going." A test of the victim's blood showed a 94 percent carbon monoxide level. Doctor McMaster testified that the average healthy adult maintains a carbon monoxide level of less than five percent and that the victim's elevated carbon monoxide level indicated significant soot or smoke inhalation.

Doctor McMaster also testified that the victim had a .28 percent blood alcohol concentration. The victim also had tetrahydrocannabinol (THC) and carboxy THC in her blood. Other drugs in the victim's system included promethazine (used for nausea, vomiting, and as a sedative), olanzapine (used as an antipsychotic drug for bipolar and schizophrenia), and noratriptyline, a metabolite of amitriptyline (used as an antidepressant). She stated that these drugs did not contribute to the victim's death. On cross-examination, she stated that all of the legal drugs found in the victim's blood, except the olanzapine, were "within the therapeutic range."

The sole defense witness was Sandra Garza, who lived at trailer "J" in the trailer park. She testified that, on the night of the fire, she "had been out kind of late." She stated, "When I got back in, ten, or maybe even less than ten minutes, [the petitioner] came to my door and knocked on it. I didn't want to open because it was late, and it scared me, because he knocked really hard on the door. And I asked who it was, and he said, 'It's your neighbor.' . . . I went ahead and opened the door." She stated that the [petitioner]'s "hair . . . was kind of wild, and he was dirty." The [petitioner] asked her for a fire extinguisher, but she did not have one. Ms. Garza testified that the [petitioner] was "really desperate" and that "he left running." She "looked at his trailer, and [she] saw that flames were coming out of the door and window." She testified that the [petitioner] ran toward the front of the burning trailer. Ms. Garza stated that "all" of the neighbors were outside. Before the fire department arrived, she saw the [petitioner] "was trying to get back in, and he was shouting . . . his wife was inside" while the neighbors held him back. Ms. Garza testified that the police never approached her to speak about the events of that night.

Id. at *1-8.

The petitioner filed a *pro se* petition for post-conviction relief on May 21, 2010, and, after the appointment of counsel, an amended petition was filed. In his petitions, the petitioner raised numerous allegations of ineffective assistance of counsel, as well as a free-standing constitutional claim that he was denied the right to trial by a fair and impartial jury. The post-conviction court conducted an evidentiary hearing, at which Cynthia Sullivan, a custodian of records for Cookeville Regional Medical Center, presented the petitioner's hospital medical records from August 8, 2005. Likewise, Tommy Copeland of the Putnam County Emergency Medical Services ("EMS") presented the petitioner's EMS records from August 8, 2005.

Dr. James William Mullen testified that he treated the petitioner in the emergency room ("ER") of Cookeville Regional Medical Center on August 8, 2005. Dr. Mullen said that the petitioner arrived around 2:10 a.m. and was discharged at 6:15 a.m. The petitioner was brought to the hospital due to "difficulty in breathing and exposure to smoke and flame." The petitioner had a blood alcohol level of .16 when he arrived. The petitioner was hyperventilating, for which he was given a breathing treatment in the ER, in addition to two treatments he received before arriving at the hospital. He was prescribed an inhaler and antibiotics at discharge. Dr. Mullen recalled that he was able to communicate with the petitioner about his condition and treatment, and the petitioner appeared to have no problem understanding the doctor or following his directions.

-12-

Jason Sparks, a paramedic with Putnam County EMS, testified that he responded to the burning house trailer around 1:00 a.m. on August 8, 2005. Sparks stated that he noted in his report that the petitioner tried to re-enter the trailer to get the victim, who was still inside. He also noted in his report that the petitioner "was very upset and had to be restrained with handcuffs." Sparks said that he did not recall an odor of gasoline on the petitioner. He recalled that the petitioner initially refused treatment and transport to the hospital but eventually agreed to both.

Randy Brown of the Putnam County Sheriff's Department testified that he responded to the scene of the fire but did not recall much of what occurred. After reviewing his report, Brown recalled that he had to restrain the petitioner at some point from trying to go back into the burning trailer.

The petitioner testified that counsel did not introduce his medical records or call any medical personnel at the suppression hearing to testify that the petitioner had a .16 blood alcohol concentration although he discussed it with counsel "numerous times." Counsel never told the petitioner how he was going to proceed and, instead, kept focusing on the statement the petitioner had given to police. The petitioner wanted counsel to put on evidence of his intoxication, injuries, and sleep-deprived state in support of suppression of his statement. Counsel also did not put on any evidence at trial about the petitioner having to be restrained from going back into the burning trailer. Counsel did not offer any evidence at trial to show the jury that the petitioner's statement should not be believed.

The petitioner stated that he gave three other statements after he left the hospital in which he denied setting the fire. He talked to counsel about putting those other statements into proof, but counsel never did so. The petitioner discussed with counsel obtaining an expert to determine the cause of the fire or help him prepare for cross-examination of the State's witnesses, but counsel told him that getting an expert "would be a waste of time because of the statement." The petitioner said that counsel was deficient in his cross-examination of one of the State's witnesses about the use of an accelerant, "pour patterns," and "char." Counsel also did not question another witness concerning why two samples from the fire scene were not taken to the Tennessee Bureau of Investigation ("TBI") crime laboratory for testing until almost three weeks later.

The petitioner testified that, after he was released from the hospital at 6:15 a.m., he took a taxi back to the trailer park. He gave statements to three different people at the trailer park, denying that he had set the fire in each of them. He left the scene that afternoon around 1:00 p.m. to have his prescriptions filled, and he drank a 40-ounce beer while he was out at approximately 1:15 or 1:30. He was then taken to the criminal justice center around 2:00 or 2:30. He had not slept all day and was tired. Later, he gave a statement to Agent

Whittaker.

The petitioner testified that counsel questioned Agent Whittaker at trial about the petitioner's lack of sleep and demeanor, but he did not "push[] the fact that" the petitioner was not given his inhaler or bring up exactly how long the petitioner had gone without sleep. Counsel did not question Agent Whittaker at trial concerning Whittaker's testimony at the suppression hearing that the petitioner "was very emotional and . . . told him [he] needed [his] inhaler."

The petitioner testified that counsel's closing argument at trial was against his interest because counsel "was more worried about pointing out the fact that [the petitioner] didn't intend to hurt [the victim] or kill her than trying to disprove the arson," and intent to kill the victim was irrelevant to a felony murder charge. Counsel failed to argue to the jury in closing or at the motion to suppress the voluntariness of the petitioner's statement and that he had given other statements prior to drinking the 40-ounce beer.

The petitioner testified that counsel, in a very short opening statement, did not mention that the petitioner's statement to police was not voluntary, that there was a delay in the lab results, or mention the issues concerning testimony about the use of an accelerant. He stated that counsel did not think that one juror needed to be removed from the jury after the juror's acquaintance with the victim's brother was brought out, even though the petitioner felt otherwise. The petitioner said that counsel did not question any of the witnesses about whether the petitioner had an odor of gasoline about him.

On cross-examination, the petitioner acknowledged that he testified at the suppression hearing concerning his state when he gave the statement and that an officer testified concerning the petitioner's blood alcohol concentration at the hospital. He admitted that he had no problem communicating with the doctor at the hospital and understanding his instructions and that the only thing that occurred between that time and his later statement to police was his drinking a 40-ounce beer. He acknowledged that one of his neighbors testified on his behalf at trial that he was distraught and upset at the time of the fire. The petitioner acknowledged that the trial judge made the final decision to not remove the juror, having determined that the juror could be fair.

Counsel testified that proof of the petitioner's intoxication came in through testimony of one of the police officers. In addition, the petitioner said in his statements that he was not drunk so counsel was not going to "put somebody on the stand that says he's intoxicated when he's saying all during the hearing he's not drunk[.]" Counsel said that he did not subpoena anyone to testify that the petitioner tried to go back into the burning trailer because he "found no evidence of that[.]" He did not think that any report from Officer Brown

-14-

saying that the petitioner was handcuffed to keep him from entering the burning trailer "was necessary to show to a jury as part of the trial tactics." Counsel denied that the petitioner asked him to subpoena any doctors, nurses, EMS workers, or reporting officers.

Asked about his arguing in closing that the petitioner did not intend to kill the victim, counsel explained that he "argue[d] plain old common sense . . . that [the petitioner] didn't intend to do anything . . . that night as it relates to killing her." Counsel testified that he did not recall the petitioner's asking him to obtain an expert witness on the cause of the fire, nor did he recall contacting any experts to help him with the arson reports. He acknowledged that an expert would be helpful to assist in cross-examining the State's witnesses where there is an issue of what caused the fire, but he "wouldn't say that [he] couldn't properly cross-examine them[.]" He did not see anything that he could take to the judge to say they needed an expert because there was not an issue about whether it was an arson.

With regard to the juror issue, counsel testified that it would have been a "problem" to have a juror who had played golf with the victim's brother, but it was for the court to decide. Counsel said that he prepared a witness list, which he discussed with the petitioner. Counsel stated that it was a trial tactic to not bring up that the petitioner gave earlier statements saying that he did not set the fire because bringing up the contradictory statements would make it look to the jury like "you're not telling the truth[.]" Counsel said that he was relying on the petitioner's being intoxicated for suppression of the statement, but the petitioner got "on the stand[] and he said he wasn't intoxicated. So . . . he kind of shot himself in the foot there[.]"

Counsel testified that he was "certain" he would have investigated whether anyone smelled gasoline on the petitioner that night but, noting that the petitioner was a painter by trade and would have been around paint thinner and other products, "[y]ou might get an answer you really didn't want to get in that situation." Counsel said that sleep deprivation could have been an issue in whether the petitioner's statement was voluntary, but he "felt like alcoholism was more important[.]"

On cross-examination, counsel testified that he and the petitioner went over the list of potential witnesses, and he attempted to locate all those witnesses but was only successfully able to locate Ms. Garza, who testified that the petitioner was trying to get back into the burning house trailer. Counsel said that, even after hearing Dr. Mullen's testimony at the evidentiary hearing, he did not believe it would have helped in any way at trial and actually thought it could have hurt to emphasize the petitioner's intoxication to such a great extent. He also thought that Dr. Mullen's testimony concerning the injuries the petitioner suffered would have been consistent with injuries of someone who had just set a fire.

Counsel stated that he was not aware of any expert opinion that would have helped him in this case because the petitioner's admission to starting the fire was consistent with the testimony of the State's witnesses. Counsel said that he cross-examined the witnesses from the fire marshal's office and, although he could not recall, was sure he would have challenged the fire dog's qualifications.

Agent Greg Whittaker, with the State of Tennessee Bomb and Arson Unit, testified that he helped investigate the fire in this case. When he arrived to the scene, the fire had already been extinguished. Asked if the home was destroyed, he stated that, from "an investigator's view, . . . the home was in pretty good shape." He did not personally take any samples or investigate the electrical system. Later that afternoon, Agent Whittaker, along with Detective Burgess, interviewed the petitioner at the justice center. Agent Whittaker acknowledged that, at trial, he testified that the petitioner's demeanor was "'Good'" during the interview but had testified at the suppression hearing that the petitioner became emotional and started crying. Agent Whittaker recalled that the petitioner became emotional after he admitted to waking up and setting the fire, but he did not recall him crying.

Agent Whittaker stated that part of his job was to take samples from fires and that it took anywhere from three days to two weeks to deliver the samples to the TBI crime lab. He explained that, during the interim, the samples would be secured in an evidence locker in the rear of his vehicle and that there would be no danger of contamination or evaporation with the method of storage they used. He said that all of the other arson investigators followed the same guidelines. He stated that he observed Agent Watson take the samples in this case, but he did not specifically know where Agent Watson stored them.

Agent Whittaker testified that the electrical fixtures did not appear to be demolished in the trailer, and he recalled another agent "working in the electrical from the area of origin to the end of the home that was in the best condition, and there was no beading or any faulty wiring found." He explained that they determined the point of origin by looking at the area that was most consumed when the fire department arrived on the scene. He acknowledged that a fire could originate in an area other than the area of heaviest damage due to air drafts or ventilation but said that, in this case, "it was evident that the fire had started on the opposite end of the house from where the victim was found." Asked whether he agreed with the National Fire Association treatise concerning use of the phrase "pour pattern," Agent Whittaker said that he did not agree that the phrase "pour pattern" should be avoided.

Agent Scott Greenwood testified that he was the lead investigator in this case. He recalled that the petitioner returned to the scene after he left the hospital and that some beer had to be taken away from him. He said that the sample he took from the fire scene would have been locked in the back of his car prior to transport to the crime lab. Agent Greenwood

-16-

had no knowledge of what Agent Watson did with the samples he took at the same time or why they were turned in to the lab so much later than Agent Greenwood's. Agent Greenwood said that the area of heaviest damage is generally where the fire originated, but that is not always the case. He also said that the term "pour pattern" should not necessarily be avoided and "was right on target" in this case. Agent Greenwood stated that he examined the stove and the wiring in the entire house. He said that the petitioner confessed to pouring gasoline on the living room floor, and "the fire pattern supported a fire starting in the living room floor."

Randall Nelson, a forensic scientist with the TBI crime lab, testified that he received three samples in this case. He received the first sample from Agent Greenwood on August 10, 2005, and testing of it did not reveal any gasoline range product. The other two samples were received from Agent Watson on August 29, 2005, even though they were listed as having been taken on August 8, 2005. He had no knowledge of where the samples were stored before they were brought to the lab. However, he said that the samples could be stored for a significant period of time without damage if they were properly collected and placed in an appropriate container. Moreover, he did not observe any damage to the air-tight containers in which the samples were brought to him.

Nelson testified that analysis of both of the samples "revealed the presence of an evaporated gasoline range product," which included "all brands and grades of automotive fuels, including gasohol." Nelson said that it was not uncommon for one sample to be negative and one sample to be positive even if they were taken from the same approximate area. He also explained that Agent Watson's samples were taken with the use of a scent-dog, and dogs "have the ability to sniff out . . . those vapors really well." He stated that it did not concern him that samples two and three arrived twenty-one days after the first sample because "these guys work out of different places, and . . . they don't always come to Nashville every day, and so it wouldn't be unusual for someone to . . . bring their samples in when they . . . have business in town."

After the conclusion of the hearing, the post-conviction court entered a written order in which it denied the petition on grounds that there was no showing that counsel's representation was constitutionally deficient or that there was a reasonable probability that the result of the proceeding would have been different.

## ANALYSIS

The petitioner argues he received the ineffective assistance of counsel, specifically asserting that counsel rendered ineffective assistance by: (1) failing to request that a juror be removed from the jury; (2) failing to present certain proof at the motion to suppress; (3)

-17-

failing to present certain proof at trial; (4) failing to obtain an expert to aid in the cross-examination of the State's experts and failing to properly cross-examine said experts; (5) failing to make a sufficient opening statement; and (6) failing to make a sufficient closing argument and including an irrelevant statement concerning his lack of intent to kill in his closing argument. He asserts that, if none of the above bases for relief entitle him to a new trial, he is nevertheless entitled to a new trial due to the cumulative effect of counsel's errors. As an independent issue, the petitioner argues that he was denied his right to a trial by a fair and impartial jury due to one juror's remaining on the jury.

Post-conviction relief is available to a petitioner who establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the post-conviction court "are entitled to substantial deference on appeal unless the evidence preponderates against those findings." Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001); see also Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review is of purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields, 40 S.W.3d at 458; Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

## I. Ineffective Assistance of Counsel

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. Ordinarily, to establish that he was denied the effective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth

Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686.

The prejudice prong of the Strickland test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

## A. Removal of Juror

The record shows that, prior to the court's lunch recess during trial, the court instructed the jury, among other things, that it was not to talk with anyone about the case or have contact with anyone "who might have some interest in the case[.]" After the recess, one juror informed the court that he had run into a "casual" acquaintance during the break and discovered that the acquaintance was the brother of the victim. The juror explained to the court that he was acquainted with the victim's brother because they had a mutual friend and had gone golfing together one time three or four years prior. In response to questioning by the court, the juror said that he and the victim's brother had no conversation about the case and that their acquaintance would have no bearing on his ability to decide the case fairly and impartially. Counsel followed up with questions to confirm the attenuated nature

of the acquaintance and that it would not impact the juror's decision in the case.

The petitioner argues that he received the ineffective assistance of counsel due to counsel's failure to request that the juror be removed from the jury. As to this issue, the post-conviction court found that "[t]here is no proof of any prejudice to petitioner resulting from trial counsel's failure to ask that the juror be removed." We agree. The juror's acquaintance with the victim's brother was casual and not ongoing. It was for the court to decide whether the juror should remain on the panel, and, after questioning, the court determined that the juror would be fair and impartial. There has been no proof offered to show that the juror was anything but fair and impartial. The record supports the post-conviction court's determination.

### B. Proof at Motion to Suppress

The petitioner argues that he received the ineffective assistance of counsel due to counsel's failure "to produce witnesses and documents" at his motion to suppress to show that his statement was involuntary. Specifically, he asserts that proof of his .16 blood alcohol content, as well as his "difficulty breathing" and "exposure to smoke" should have been offered through testimony from Dr. Mullen, the treating emergency room physician. He also asserts that Jason Sparks, a paramedic, should have been called to testify that the petitioner "had burns to his body and was so upset [he] had to be restrained with handcuffs from going back inside the burning trailer." As detailed above, the petitioner offered testimony from both of these individuals at the evidentiary hearing.

With regard to this issue, the post-conviction court found that "[n]othing presented in the medical proof through the emergency room physician and the EMS records would suggest that petitioner[']s condition some twelve (12) hours after discharge from the emergency room would have prevented him from voluntarily and knowingly giving his confession." Thus, the court concluded that "failure to call these medical personnel for the suppression hearing was of no consequence [as] [t]heir testimony would not likely have changed the ruling of the court on allowing the confession to be admitted."

The record supports the post-conviction court's determination. Dr. Mullen testified at the evidentiary hearing that the petitioner's blood alcohol content was .16 when he arrived around 2:00 a.m., and he was discharged four hours later. The doctor said that he was able to communicate with the petitioner about his condition and treatment and that the petitioner appeared to have no problem understanding him or following his directions. There is simply no proof from Dr. Mullen's testimony or the EMS records that would suggest the petitioner's condition more than twelve hours after discharge from the emergency room and sixteen hours after his blood alcohol content was tested would have prevented him from

knowingly and voluntarily giving his statement of confession. In addition, counsel testified at the evidentiary hearing that the petitioner testified at the suppression hearing that he was not intoxicated, even though intoxication was the basis they were using to seek suppression. Therefore, the petitioner undermined his own case for getting his statement suppressed, making it even less probable that Dr. Mullen's testimony or the EMS records would have changed the outcome of the hearing.

We turn next to the petitioner's assertion that testimony from Jason Sparks should have been offered at the suppression hearing to show that he had to be restrained from going back inside the burning trailer. The petitioner has failed to prove how this testimony would have possibly changed the court's decision concerning the voluntariness of the petitioner's statement, given approximately eighteen hours after the interaction with Sparks, especially in light of testimony from Agent Greenwood that the petitioner appeared calm at the time of the statement. Thus, we discern no prejudice caused by counsel's failure "to produce witnesses and documents" at the motion to suppress.

## C.  Proof at Trial

The petitioner argues that he received the ineffective assistance of counsel due to counsel's failure "to produce witnesses and documents at trial for the jury to consider." He asserts that testimony and records concerning his blood alcohol content and injuries should have been presented to the jury for it to "consider . . . in the weight [it] gave to the [petitioner]'s statement[.]" He also asserts that testimony from Jason Sparks, the paramedic, and Officer Randy Brown should have been offered to show that he had to be restrained from trying to get back into the burning trailer and that he did not smell of gasoline, which "would have been important in the jury's decision as to whether [the petitioner] caused the fire."

With regard to evidence concerning the petitioner's blood alcohol content and injuries, as determined above with regard to the motion to suppress, we do not see how such evidence would have had any impact on the "weight" the jury gave to the petitioner's statement, which was given more than twelve hours after he left the hospital. Thus, the petitioner has failed to show prejudice. With regard to counsel's failure to call Sparks and Officer Brown to testify concerning the petitioner's having to be restrained, we likewise discern no prejudice because evidence of such was offered through other witnesses. On cross-examination, Michael Keith, a firefighter with the Murfreesboro Fire Department and volunteer with the Putnam County Fire Department, testified that the petitioner "had to be restrained by Sheriff's deputies to prevent him from running back into the trailer." Virga, 2009 WL 537560, at *5. In addition, Sandra Garza, one of the petitioner's neighbors, testified that, on the night of the fire, the petitioner, who was highly upset, knocked hard on

her door, asking for a fire extinguisher, and that she also saw him trying to get back into the burning trailer.  Id. at *8.

### D.  Expert Witnesses

The petitioner argues that he received the ineffective assistance of counsel due to counsel's failure to properly cross-examine the State's expert witnesses and failure to obtain an expert to aid in cross-examination of the State's expert witnesses.  He asserts that counsel needed guidance from a fire or arson expert in order to properly cross-examine the State's fire experts.  Along the same lines, he asserts that several areas of the State's fire experts' testimony should have been questioned; namely, the delay in sending two of the samples from the fire to the TBI for testing, other possibilities for the point of origin, when the samples were taken in relation to the removal of ash and debris, use of the term "pour pattern," and indicators that an accelerant was used.

As to this issue, the post-conviction court found that the "petitioner did not present any evidence which would call into question [the State's experts'] findings and conclusions.  Again[,] counsel could have possibly asked more aggressive questions or presented an expert to explain an opposing point of view, but this court does not believe failure to do so was ineffective."

At the evidentiary hearing, the petitioner questioned the State's experts using information from a National Fire Association publication about use of the term "pour pattern" and indicators that an accelerant was used.  The witnesses did not agree with post-conviction counsel that the publication was authoritative, deeming it only an opinion, and they explained why they believed an accelerant was used and why the term "pour pattern" was on-point in this case.  They also explained how the point of origin was determined.  In addition, the TBI scientist explained that it was not unusual for samples to arrive at the lab some time after being taken from a scene.  We simply cannot conclude that the petitioner has established a reasonable probability that the outcome of the trial would have been different had counsel conducted a more thorough cross-examination or hired an expert to assist him in cross-examination.  The State's experts testified as to what caused the fire and their reasons for reaching that conclusion, and the petitioner's statement was consistent with the experts' findings. He has not presented a witness in the post-conviction proceeding to rebut the State's experts' testimony.

### E.  Opening Statement

The petitioner argues that he received the ineffective assistance of counsel due to counsel's failure to make a sufficient opening statement to the jury.  He asserts that, in

addition to being very short, the opening statement was defective in that counsel did not prepare the jury for it to consider reasonable doubt, did not "impress the jury with the testimony that . . . could have been presented concerning the [petitioner]'s condition and what [he] had been through prior to his statement," did not suggest that the statement was involuntary, referred to the statement as a confession, and did not "prepare the jury to consider flaws in the State's expert witnesses' testimonies." In support of his argument, the petitioner relies on State v. Zimmerman, 823 S.W.2d 220 (Tenn. Crim. App. 1991).

We initially note that Zimmerman is distinguishable from the present case because Zimmerman presented a situation where counsel promised the jury that the defendant would testify in support of a certain defense, but the defendant did not testify and counsel essentially abandoned a defense mid-trial. Id. at 225-26. Here, counsel's opening statement touched on the petitioner's being awake for a long period of time prior to giving his confession and his attempting to go back in the burning trailer to rescue the victim, indicating his lack of an intent to kill the victim. Counsel's opening statement, albeit short and direct, was consistent with his theory of defense and informed the jury of evidence he could prove. In addition, counsel's referring to the petitioner's statement as a "confession" could reasonably be viewed as a trial tactic to lessen its impact on the jury. We cannot conclude that counsel's opening statement fell below an objective standard of reasonableness or that there is a reasonable probability that the outcome of the trial would have been different had a longer or more detailed opening statement been given.

## F. Closing Argument

The petitioner argues that he received the ineffective assistance of counsel due to counsel's "failing to make a sufficient closing argument to the jury" and including an irrelevant statement that the petitioner did not intend to kill the victim. The petitioner asserts that counsel should have pointed out that there could have been another cause for the fire, should have discussed the delay in the delivery of two of the samples to the TBI lab, and should have talked about the petitioner's condition at the time of his statement and why the statement should not be given credibility. The petitioner also asserts that counsel argued irrelevantly in closing that the petitioner did not intend to kill the victim, which had no bearing on a felony murder charge.

We have reviewed the closing argument given by counsel and cannot determine that the petitioner received the ineffective assistance of counsel in this regard. Although the closing argument was perhaps not as thorough as the petitioner, in hindsight, would have liked, counsel appealed to the jurors' "common sense and humanity," while also positing another possible cause for the fire (that the victim may have started it while under the influence and taking prescription medication) and reiterating how the petitioner tried to go

back into the burning trailer. All of the evidence the petitioner wishes counsel had reiterated during closing was before the jury, and we cannot conclude that a more extensive closing argument would have changed the outcome of the proceeding.

We also cannot conclude that counsel rendered ineffective assistance with regard to his closing argument concerning the petitioner's intent. Counsel testified at the evidentiary hearing that he "argue[d] plain old common sense . . . that [the petitioner] didn't intend to do anything . . . that night as it relates to killing her." It appears that counsel's strategy in arguing such was to minimize the petitioner's culpability in the minds of the jurors. In any event, we cannot conclude that counsel's closing argument negatively affected the outcome of the trial. The jury heard proof at trial of the evidence of arson and that the petitioner confessed to starting the fire. In light of such proof, we see no reasonable probability that the outcome of the trial would have been different had counsel argued differently.

## G. Cumulative Errors

The petitioner argues that he was denied the effective assistance of counsel due to the cumulative effect of counsel's errors. The petitioner is merely resubmitting the issues he has already presented, and we respectfully disagree with his assertion that he is entitled to a new trial based on cumulative error.

## II. Trial by a Fair and Impartial Jury

The petitioner argues that he was denied the right to a fair and impartial jury because of one juror's remaining on the panel. He cites Hyatt v. State, 430 S.W.2d 129 (Tenn. 1967), in support of his assertion that he "was entitled to a jury that was free of even a suspicion of bias and prejudice." Hyatt involved a situation where a juror had past personal experience with the defendant, which included the juror's "'procur[ing] a search warrant'" against the defendant because the juror suspected the defendant was supplying the juror's son-in-law with whiskey. Id. at 129-130. The circumstances concerning the juror in the present case differ drastically from those in Hyatt. Upon review, we fail to see the remotest suggestion of a suspicion of bias and prejudice in the juror's past, attenuated acquaintance with the victim's brother. The petitioner has not proven, by clear and convincing evidence, that he was denied the right to a fair and impartial jury.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the

petitioner's petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE